32 A.3d 1195

**Robert C. WILLIAMS, Appellant**

v.

**GEICO GOVERNMENT EMPLOYEES INSURANCE COMPANY, Appellee.**

**Geico Government Employees Insurance Company, Appellee**

v.

**Robert C. Williams, Appellant.**

Supreme Court of Pennsylvania.

Argued April 14, 2010.

Decided Oct. 19, 2011.

Gary M. Lightman, Lightman Welby Stoltenberg & Caputo, Scott B. Cooper, Schmidt Kramer, P.C., Harrisburg, Lawrence M. Kelly, Luxenberg, Garbett, Kelly, & George, P.C., Newcastle, Sandra Schultz Newman, for Robert C. Williams.

David C. Harrison, Philadelphia, for Appellant Amicus Curiae, Pennsylvania Association for Justice.

Richard E. Freeburn, Freeburn & Hamilton, Harrisburg, for Appellant Amicus Curiae, the Pennsylvania State Troopers Association.

Joseph A. Hudock, Jr., Summers, McDonnell, Hudock, Guthrie & Skeel, L.L.P., Pittsburgh, for Geico Government Employees Insurance Company.

Robert A. Loch, Robb Leonard Mulvihill, L.L.P., Pittsburgh, for Appellee Amicus Curiae, PA Defense Institute.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice ORIE MELVIN.

This is a discretionary appeal from the December 29, 2008 Superior Court order, which affirmed the trial court's grant of summary judgment to Appellee, GEICO Government Employees Insurance Company ("GEICO"). We granted review to

address whether the "regular-use" exclusion contained in a personal automobile insurance policy is valid to preclude payment of underinsured motorist ("UIM") benefits to a police officer injured in the course of employment while operating a police vehicle for which the officer did not have the ability to obtain UIM coverage. In light of our precedent and in consideration of Pennsylvania's Motor Vehicle Financial Responsibility Law ("MVFRL"),[1] we affirm.

The facts are undisputed. Appellant Robert C. Williams ("Williams") has been a Pennsylvania State Police Trooper since 1994. On June 23, 2004, Williams was seriously injured in an automobile accident while operating a Ford Crown Victoria owned and maintained by the Pennsylvania State Police.[2] Williams has been unable to return to his duties due to his injuries.

At the time of the accident, Williams maintained a personal automobile insurance policy with GEICO. Appellant's policy included UIM coverage with limits of $50,000 per person and $100,000 per accident with stacking available. Williams sought to recover UIM benefits from GEICO for the June 23, 2004 accident. GEICO denied coverage, citing the regular-use exclusion contained in the policy, which provided:

When This Coverage Does Not Apply:

9. When using a motor vehicle furnished for the regular use of you, your spouse, or a relative who resides in your household, which is not insured under this policy.

GEICO's Motion for Summary Judgment and Brief in Support, 1/26/07, Ex. C at 19.

On May 19, 2006, Appellant instituted a civil action [3] against Joseph Stickley, the driver of the other vehicle. On July 21,

1. 75 Pa.C.S. § 1701 *et seq.*

2. As the Commonwealth is a self-insured entity, the Department of General Services is the insurer.

3. The record does not indicate the ultimate resolution of that separate litigation but states only that Stickley "did not have sufficient insurance coverage available to reimburse [Williams] for the injuries and damages that he sustained." Appellant's Petition to Compel Arbitration, 7/21/06, at ¶ 5.

2006, Williams filed a petition to compel UIM arbitration against GEICO. GEICO answered the petition and filed a declaratory judgment action seeking a judicial determination that its policy did not cover the accident because of the regular-use exclusion.

GEICO filed a motion for summary judgment in the declaratory judgment action, which the trial court consolidated with the petition to compel arbitration. Thereafter, the trial court granted GEICO's motion for summary judgment, finding that the regular-use exclusion precluded Appellant's recovery. The court also denied Appellant's petition to compel arbitration. Williams filed a timely appeal to the Superior Court.

The Superior Court affirmed in an unpublished memorandum. *Williams v. Geico Gov't Employees Ins.*, No. 931 WDA 2007, 968 A.2d 804 (Pa.Super. December 29, 2008) (unpublished memorandum). The court found that it was bound by a prior panel decision in *Brink v. Erie Ins. Group*, 940 A.2d 528 (Pa.Super.2008), in which the Superior Court held that a Swatara Township police officer could not recover UIM benefits under his personal automobile policy for injuries sustained in an accident that occurred in the course and scope of his employment because of the regular-use exclusion.[4] The Supe-

---

4. The Superior Court panel herein stated that "left with a blank slate on this issue, we would conclude that the distinctions noted in footnote 7 of *Brinks* [sic] are sufficient distinguishing circumstances to invalidate the application of the policy exclusion to the facts in this case." *Williams*, No. 931 WDA 2007, at 6. The *Brink* court discussed our prior decision in *Burstein v. Prudential Property & Cas. Ins. Co.*, 570 Pa. 177, 809 A.2d 204 (2002) and stated in relevant part:

The [Supreme] Court, in effect, said that the employee has the responsibility to inquire as to the extent of UIM coverage provided by the employer on its provided vehicles. Once the employee determines that the employer does not have the hoped-for coverage, the [Supreme] Court said the employee has one of three options: (1) the employee can drive without the UIM coverage (because Pennsylvania does not require it); (2) the employee can attempt to obtain UIM coverage by either negotiating with the employer to provide it or privately purchasing coverage; or (3) the employee can refuse to drive an employer-provided vehicle.

The *Burstein* options may not be available to police officers. Unlike private sector employees, police officers may not be able, as members of a union, to make such inquiry of an employer, to try to negotiate with the employer or to refuse to drive the municipality-provided

rior Court concluded that *Brink* was directly on point and found that the regular-use exclusion was not against public policy applied to a police officer injured while driving a police vehicle in the line of duty.

This Court granted Appellant's petition for allowance of appeal, limited to whether public policy requires permitting a police officer to recover UIM benefits under his personal automobile insurance policy, when the recovery would be otherwise precluded by the policy's "regular use" exclusion.[5] Williams presently argues that because of the unique factual circumstances and challenges he faces as a Pennsylvania state trooper, his insurer should provide him with UIM coverage despite the unambiguous policy exclusion because Pennsylvania has a strong public policy of protecting police officers and other first responders such that they are entitled to special treatment. Consistent with that view, Williams submits that the factual distinctions between himself and the insured in *Burstein* are sufficient to require a different outcome.[6] Williams further argues that the exclusion violates the plain

> police vehicles. Further, private purchase of UIM benefits may not be a realistic option because such insurance may not be available. We decline to do more than make the above observations. While the issue is better addressed by the legislative or the executive branch, we do observe that the facts of *Burstein* are different from the facts in this case.
>
> *Brink*, 940 A.2d at 538 n. 7 (internal citations omitted).

5. We note that in our order granting allowance of appeal, we rephrased the question on appeal and assumed that Appellant could not have obtained UIM coverage for his police vehicle. *See Williams v. Geico Government Employees Ins. Co.*, 986 A.2d 45 (Pa. 2009). Indeed, this rephrasing was based on the Superior Court's conclusion that Appellant, as part of a collective bargaining unit, could not individually bargain with the Pennsylvania State Police to obtain UIM coverage from them for the vehicle, nor could he purchase his own coverage for that vehicle. *See Williams*, No. 931 WDA 2007, unpublished memorandum at 5 (citing *Brink*, 940 A.2d at 538 n. 7). However, as we discuss below, the record is devoid of any evidence as to whether Appellant could have purchased additional UIM coverage that could apply in regularly-used vehicles as a rider on his personal policy from Appellee.

6. In his brief, Appellant discusses the distinctions between his circumstances and those in *Burstein* before addressing the public policy concern. For ease of discussion, we address the general public policy concerns first.

language of the MVFRL because it excludes UIM coverage without a written rejection as required by 75 Pa.C.S. § 1731. In advancing his position, Appellant relies heavily on Mr. Justice Saylor's dissenting opinion in *Burstein*.

The Pennsylvania Association for Justice ("PAJ")[7] filed an *amicus curiae* brief in support of Appellant. PAJ argues that the regular-use exclusion should never apply to any employee operating an employer's fleet vehicle to which the employee is not regularly assigned. In support of its position, PAJ relies on published and unpublished federal decisions. Similarly, the Pennsylvania State Trooper's Association ("PSTA") filed an *amicus curiae* brief in support of Trooper Williams, emphasizing the policy considerations that favor extending private UIM benefits to police officers injured in motor vehicle accidents that occur in the line of duty. The PSTA asserts that citizens of this Commonwealth recognize the important role police officers play in protecting the public and, in turn, unanimously agree that their rights should be safeguarded.

GEICO responds that we have previously approved of the regular-use exclusion in similar circumstances and that no valid reason exists to invalidate the exclusion generally. GEICO also contends that although the legislature has seen fit to afford police officers and other first responders special protections under the law, it specifically decided not to require their private insurers to provide UIM coverage while first responders operate their work vehicles. Therefore, GEICO submits, we should not infringe on the legislature's prerogative to enact such a policy. Finally, GEICO argues that we previously rejected Appellant's broad reading of the MVFRL in *Burstein*.

The Pennsylvania Defense Institute ("PDI") submitted an *amicus curiae* brief in support of GEICO. PDI suggests that Pennsylvania law has consistently recognized the regular-use exclusion and its applicability to the instant facts beginning with *Burstein* and continuing through Superior Court opinions including *Brink*. PDI also contends that Trooper Williams'

---

7. Formerly known as the Pennsylvania Trial Lawyers' Association.

status as a police officer should not exempt him from existing law. PDI concedes, however, that the legislature retains the prerogative to allow first responders to recover benefits from their private automobile insurance policies if injured in a work vehicle. Finally, PDI refutes Appellant's argument regarding the conflict between the exclusion and the MVFRL, noting that a plethora of decisions by this Court and the Superior Court have all recognized the validity of exclusions to the mandatory offering of UIM coverage.

 In the instant case, we must determine whether the regular-use exclusion, as applied to a state trooper, is void as against a public policy that favors protecting first responders. The issue presented is purely legal; thus our scope of review is plenary and our standard of review is de novo. *Generette v. Donegal Mut. Ins. Co.*, 598 Pa. 505, 957 A.2d 1180, 1189 (2008).

 In construing a policy of insurance, we are required to give plain meaning to a clear and unambiguous contract provision unless such provision violates a clearly expressed public policy. *Burstein*, 809 A.2d at 206 (citing *Eichelman v. Nationwide Ins. Co.*, 551 Pa. 558, 711 A.2d 1006, 1008 (1998)); *Prudential Prop. and Cas. Ins. Co. v. Colbert*, 572 Pa. 82, 813 A.2d 747, 750 (2002) (same). Here, Appellant concedes that the policy language is unambiguous, thereby challenging the exclusion solely on the grounds of public policy. We consistently have been reluctant to invalidate a contractual provision due to public policy concerns. In *Eichelman*, we stated:

Generally, a clear and unambiguous contract provision must be given its plain meaning unless to do so would be contrary to a clearly expressed public policy. When examining whether a contract violates public policy, this Court is mindful that public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract. As this Court has stated:

Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found definite indications in the

law of the sovereignty to justify the invalidation of a contract as contrary to that policy[.] ... Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts ... contrary to public policy. The courts must be content to await legislative action.

This Court has further elaborated that:

It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract is against public policy].

*Eichelman,* 711 A.2d at 1008 (internal citations omitted). Therefore, Appellant must meet a high burden to invalidate a contractual provision due to a conflict with public policy.

In *Eichelman,* we also addressed the general policy underlying underinsured motorist coverage. We stated:

[U]nderinsured motorist coverage serves the purpose of protecting innocent victims from underinsured motorists who cannot adequately compensate the victims for their injuries. That purpose, however, does not rise to the level of public policy overriding every other consideration of contract construction. As this Court has stated, "there is a correlation between premiums paid by the insured and the coverage the claimant should reasonably expect to receive." *Hall v. Amica Mut. Ins. Co.,* 538 Pa. 337, 349, 648 A.2d 755, 761 (2004).

*Id.* at 1010.

Moreover, in his Concurring and Dissenting Opinion in *Colbert,* then-Justice, now-Mr. Chief Justice Castille noted:

The overriding concern powering the decisions in *Burstein, Eichelman,* and the earlier cases is to ensure that both insurer and insured receive the benefit of what is statutorily required and contractually agreed-upon (consistently with statutory requirements) and nothing more. As this Court

recognized in *Eichelman,* an insured should not be permitted to demand coverage for a risk for which coverage was not elected or premiums paid.

*Colbert,* 813 A.2d at 759 (Castille, J., concurring and dissenting).

■ With this framework in mind, we review Appellant's argument that applying the regular-use exclusion to police officers and other first responders violates public policy. In recent years, litigants have claimed that specific policy provisions, including the regular-use exclusion, violate the policies expressed in or underlying the MVFRL. *Pennsylvania Nat. Mut. Cas. Co. v. Black,* 591 Pa. 221, 916 A.2d 569, 578 (2007). In the present case, however, Appellant asserts that the application of the regular-use exclusion to first responders violates an overwhelming public policy in favor of protecting first responders as a class. In support of his position, Appellant cites several statutory provisions outside the MVFRL that apply to first responders, including the Heart and Lung Act,[8] the Workers' Compensation Act,[9] the Occupational Disease Act,[10] and the Emergency Medical Services Act.[11]

Appellant relies upon section 637 of the Heart and Lung Act, which applies to a wide variety of individuals Appellant recognizes as "first responders," including state police troopers such as Appellant. 53 P.S. § 637.[12] Under section 637, if any enumerated individual is injured or temporarily incapacitated in the line of performing his duties, such individual is entitled to receive his full rate of salary until the disability ceases. 53 P.S. § 637(a). Further, the Commonwealth or the

8. Act of June 28, 1935, P.L. 477 §§ 1–2, as amended, 53 P.S. §§ 637–638.

9. Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §§ 1–1041.1; 2501–2626.

10. Act of June 21, 1939, P.L. 566, as amended, 77 P.S. § 1201 *et seq.*

11. Act of August 18, 2009, P.L. 308, as amended, 35 Pa.C.S. § 8101 *et seq.*

12. Other enumerated beneficiaries include "enforcement officers and investigators for the Pennsylvania Liquor Control Board, parole agents, corrections officers, psychiatric security aides, drug enforcement agents, policemen, firemen, and park guards." 53 P.S. § 637.

authority responsible for employing the individual is responsible for all medical and hospital bills related to the injury. *Id.* If the individual recovers workers' compensation while receiving benefits under section 637, the workers' compensation benefits must be transferred to the employer or deducted from the salary payments to avoid a windfall to the employee. *Id.* Moreover, if the individual is employed in that capacity for a continuous four years and develops "diseases of the heart and tuberculosis of the respiratory system, contracted or incurred by any of them after four years of continuous service as such, and caused by extreme overexertion in times of stress or danger or by exposure to heat, smoke, fumes or gases, arising directly out of the employment," the Heart and Lung Act creates a rebuttable presumption that the injuries or disease were caused by the employment. 53 P.S. § 637(b).

We have stated that the Heart and Lung Act must be strictly construed because it varies the common law by imposing liability on employers regardless of fault for their employees' injuries. *City of Erie v. Workers' Compensation Appeal Board (Annunziata)*, 575 Pa. 594, 838 A.2d 598, 604 (2003). The benefits are designed to compensate temporary rather than permanent disability. *Id.* In *Annunziata*, we recognized that the statute was enacted to protect the municipality rather than the responder by enticing the most qualified individuals to undertake such employment. We stated, "Efficient firemen and police officers must take chances; the performance of their duties are hazardous. The prospect of uninterrupted income during periods of disability well may attract qualified persons to these vocations." 838 A.2d at 603 (quoting *Kurtz v. City of Erie*, 389 Pa. 557, 133 A.2d 172, 177 (1957) (citation and quotation omitted)). Stated differently, we concluded that the legislature intended to incentivize employment in the enumerated occupations to ensure the highest qualified persons would accept the positions, therefore benefitting the municipality. Based on our prior interpretation of the Heart and Lung Act, we cannot conclude that it represents a public policy decision by the legislature to protect first responders.

Appellant also claims that section 108(m.1) of the Workers' Compensation Act demonstrates a legislative intent to provide special protection to first responders.[13] Section 108 of the Workers' Compensation Act limits the scope of "occupational diseases" to an enumerated list of physical ailments. Relevant to Appellant's argument, section 108(m.1) recognizes Hepatitis C as an "occupational disease" for purposes of workers' compensation benefits relative to certain emergency personnel including state police officers. 77 P.S. § 27.1(m.1). It further establishes a rebuttable presumption that the disease was caused by the employee's duties. *Id.* Appellant asserts that section 108(m.1) operates in concert with section 301(e) of the Occupational Disease Act to establish the rebuttable presumption of causation.[14] However, section 301(e) states:

If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the employe's occupational disease

13. Section 108(m.1) is codified at 77 P.S. § 27.1(m.1) and states:

(m.1) Hepatitis C in the occupations of professional and volunteer firefighters, volunteer ambulance corps personnel, volunteer rescue and lifesaving squad personnel, emergency medical services personnel and paramedics, Pennsylvania State Police officers, police officers requiring certification under 53 Pa.C.S. Ch. 21 (relating to employees), and Commonwealth and county correctional employes, and forensic security employes of the Department of Public Welfare, having duties including care, custody and control of inmates involving exposure to such disease. Hepatitis C in any of these occupations shall establish a presumption that such disease is an occupational disease within the meaning of this act, but this presumption shall not be conclusive and may be rebutted. This presumption shall be rebutted if the employer has established an employment screening program, in accordance with guidelines established by the department in coordination with the Department of Health and the Pennsylvania Emergency Management Agency and published in the Pennsylvania Bulletin, and testing pursuant to that program establishes that the employe incurred the Hepatitis C virus prior to any job-related exposure.

14. Appellant's citation to 77 P.S. § 301(e) as the Occupational Disease Act actually is a section of the Workmen's Insurance Board Act that was repealed in 1996. Act of June 24, 1996, P.L. 350. Section 301(e) is contained in the Workers' Compensation Act and codified at 77 P.S. § 413. We analyze Section 301(e) of the Workers' Compensation Act accordingly.

arose out of and in the course of his employment, but this presumption shall not be conclusive.

77 P.S. § 413.

Finally, Appellant contends that the Emergency Medical Services Act ("EMSA") demonstrates added protection for first responders.[15] The EMSA provides that emergency medical technicians, paramedics, and other health professionals acting as emergency medical personnel will be exempt from civil liability for damages, absent a showing that the personnel acted with either "gross negligence or willful misconduct." 35 Pa.C.S. § 8151. The EMSA, however, does not reference police officers. *Id.* Therefore, we fail to see the relevance to the instant matter.

Appellant asks us to weigh the alleged unanimous public policy evident in the above-referenced statutes against the overriding public policy concerns we have recognized underlying the MVFRL—namely, cost containment. *See Generette,* 957 A.2d at 1192. However, while we agree that there is a strong public policy in favor of protecting first responders, the statutory provisions Appellant cites demonstrate that the public policy is narrower than Appellant suggests. Examining the statutes, there is no cohesive intent by the legislature to provide special "protections" to first responders applicable to the facts of the instant case. The provisions refer neither to insurance coverage nor to automobiles generally. Therefore, we are compelled to conclude that Appellant's suggested public policy does not exist in the statutes.

Moreover, to the extent that we can glean a coherent public policy from these individual statutory provisions,[16] such policy

15. In his brief, Appellant cites to 35 P.S. § 6931(j). That section was repealed in August 2009, effective February 16, 2010, and replaced with 35 Pa.C.S. § 8151.

16. The holding in *Annunziata* casts doubt upon the policy of "protection" identified by Appellant, as we have stated unequivocally since 1957 that Heart and Lung Act benefits were not designed to protect first responders but rather to protect the municipality. *Kurtz,* 133 A.2d at 177; *Iben v. Borough of Monaca,* 158 Pa.Super. 46, 43 A.2d 425, 427 (1945). This recognition, however, is not a diminishment of the importance of first responders and police officers to their community. Rath-

does not evince any intent by the legislature to protect first responders from the consequences of their private contractual agreements. Indeed, if any public policy can be derived from these statutes, it is clear that the statutes favor requiring the first responder's employer to protect its employee, rather than any private person or entity.

Even if those statutes could be read to provide some general "protection" for first responders, as Appellant suggests, he has failed to establish any unanimity of opinion that private insurers should provide coverage for unknown risks that may arise out of their insureds' employment simply because an insured may be a police officer. Appellant does not cite to any provisions that place a burden on private entities such as GEICO in these situations. Therefore, we decline to hold that such unanimity exists.

Having found that there is no unanimity of opinion favoring expanding the scope of a first responder's private UIM insurance, we must determine whether the regular-use exclusion, applied to a police officer injured in the line of duty, is so against the public health, safety, morals, or welfare to warrant invalidating the contractual provision on public policy grounds. *Eichelman*, 711 A.2d at 1009. In the instant case, Appellant has not presented any argument that binding him to the terms of his private contractual agreement in this scenario is contrary to public health, safety, welfare, or morals. Rather, he contends that applying the exclusion violates a statutory scheme of protection that we have already concluded is narrower than Appellant argues.

■ Even if we were to find that the statutes reflect the public policy suggested by Appellant, we could not conclude that it requires invalidating the regular-use exclusion. Appellant asks us to weigh the protection of first responders against the recognized scheme of cost containment underlying the

er, the question pertains to whether the legislature has demonstrated an intent to statutorily provide certain protections to first responders as a result of the important role they play in society. Based on our precedent and the legislative history, we cannot conclude that the General Assembly has chosen to protect first responders to the extent that Appellant claims.

MVFRL. We have consistently held, however, that it is not the proper function of this Court to weigh competing public policy interests; rather that task is best suited for the legislature. *Generette*, 957 A.2d at 1192 (quoting *Black*, 916 A.2d at 580).

In addition to analyzing the overall policies, however, our final determination of whether the exclusion complies with public policy is dependent on the factual circumstances of each case. *Colbert*, 813 A.2d at 752 (citing *Paylor v. Hartford Ins. Co.*, 536 Pa. 583, 640 A.2d 1234, 1240 (1994)). In this regard, Appellant suggests that his circumstances are sufficiently distinguishable from those in *Burstein* to warrant recovery. Therefore, we briefly address the *Burstein* decision.

Sid and Doreen Burstein were injured in an automobile accident while operating a vehicle owned by Mrs. Burstein's employer and provided to her as a benefit of employment. The Bursteins recovered benefits from the tortfeasor involved in the accident but were not fully compensated for their injuries. Accordingly, they attempted to recover UIM benefits from her employer's insurer. The Bursteins discovered that the employer waived UM/UIM coverage on the policies. They then sought UIM benefits from their own insurer, Prudential, which denied coverage based on the regular-use exclusion.

The Bursteins sued Prudential, claiming the regular-use exclusion violated public policy. A panel of arbitrators found that the exclusion violated public policy as to Mr. Burstein but not as to Mrs. Burstein. Following a *de novo* trial, the trial court held the regular-use exclusion violated public policy as to both. Prudential appealed, and the Superior Court affirmed in an *en banc* decision. This Court granted allocatur on the issue of whether the regular-use exclusion was void as against public policy. *Id.*

On appeal, we recognized that the Bursteins' assertions of public policy necessarily competed with the policy concern underlying the MVFRL—the spiraling consumer costs of automobile insurance. *Id.* at 207–08. We specifically found that voiding the exclusion would frustrate the public policy of cost

containment in the MVFRL because "the insurer would be forced to underwrite unknown risks that it has not been compensated to insure." *Id.* at 208.

In dissent, Mr. Justice Saylor analyzed the development of the law regarding UIM benefits from the time Pennsylvania repealed the No–Fault Motor Vehicle Insurance Act and replaced it with the MVFRL and stated:

> In my view, the specific question at the center of this appeal is whether the General Assembly intended to incorporate a fixed concept of portability into the statute, thus foreclosing the employment of geographic exclusions such as the [regular-use] exclusion.

*Id.* at 221 (Saylor, J., dissenting).

Following a thorough analysis of the development of UIM law and portability both in and outside Pennsylvania, Mr. Justice Saylor concluded that the General Assembly did not intend to incorporate such a fixed concept in the statute but that the Pennsylvania Insurance Department was to play a role in crafting regulations outlining the attributes of required UIM coverage. *Id.* Based on the Insurance Department's regulations pertaining to the portability of UM coverage and despite its silence regarding UIM coverage, Mr. Justice Saylor opined that he would hold that the regular-use exclusion violated public policy reflected in the regulations. *Id.* at 231.[17]

Distinguishing the instant matter from *Burstein*, Appellant directs us to the following excerpt from that decision:

17. Specifically, Mr. Justice Saylor relied on 31 Pa.Code § 63.2, which states:

§ 63.2. Extent of coverage to be offered.
(a) The extent of the coverage which shall be offered as "Uninsured Motorists Coverage" shall be at least that coverage contained in the sample form in Exhibit C, which is the National standard form for this insurance.
(b) An endorsement shall be issued by insurers to effect removal of an exclusion not listed in Exhibit C: Exclusions. A notice shall accompany each endorsement at the initial policy writing or at renewal which notice fully informs the insured of his right to reopen claims where a previous claim was denied under the exclusion on or after April 13, 1978.
(1) The endorsement and notice shall be submitted to the Bureau of Regulation of Rates and Policies for prior approval. Insurers or

From a practical standpoint, Mrs. Burstein should have taken affirmative steps to determine whether the employer-provided vehicle was insured and, if so, with what types of coverage. This is especially glaring in view of Mrs. Burstein's use of employer-provided vehicles for over eight years. Stipulated Facts at 2. Once she would have discovered the lack of UIM coverage, she would have had several options. First, she could have accepted the vulnerability of driving the vehicle without UIM coverage. While this may not have been the option preferred by Mrs. Burstein, this Commonwealth does not require UIM coverage. See 75 Pa.C.S. § 1731(a) (requiring the offer of UM and UIM motorist coverage, but declaring that such coverage is optional). Thus, tolerating the risk of injury from an underinsured motorist was a viable option for Mrs. Burstein. Second, she could have obtained UIM coverage for the vehicle in either of two ways: she could have negotiated with her employer for it to purchase UIM coverage on the vehicle; or, if the employer refused, there is no evidence of record suggesting that Mrs. Burstein could not have purchased the coverage herself. Lastly, if Mrs. Burstein could neither obtain the desired UIM coverage nor accept the risk of driving the employer-provided vehicle without UIM coverage, then she could have refused to drive the car.

*Id.* at 209–10.[18]

Here, Appellant contends that he could not purchase separate UIM insurance for coverage while driving a state police

rating organizations on behalf of their members and subscribers shall make the filings not later than August 15, 1979.

(2) The following notice will be deemed to meet the requirements of this subsection:

On April 13, 1978, the Superior Court of Pennsylvania declared void an exclusion which denies Uninsured Motorists coverage when an insured is injured while occupying an uninsured motor vehicle owned by that insured. Accordingly, insurers cannot deny coverage solely by reason of that exclusion for claims made or pending on or after April 13, 1978. Contact your agent if you think you are entitled to payment as a result of this change to your policy as of April 13, 1978.

18. Appellant selectively quotes from *Burstein* in support of his claim that the above paragraph was crucial to our holding therein. Appel-

vehicle, nor could he negotiate with the Pennsylvania State Police to provide such coverage to its employees. He also notes that the Commonwealth, as a self-insured entity, is not required to offer UIM coverage. 75 Pa.C.S. § 1787. Finally, Trooper Williams underscores that he was required to use a state police vehicle while on duty, and he was not permitted to use a state police vehicle in any personal capacity while not on duty. As such, Appellant argues that the facts are distinguishable from those in *Burstein,* where Mrs. Burstein paid her employer a premium to use the vehicle at any time and could have either purchased UIM coverage for the vehicle or negotiated with her employer to provide UIM coverage. We find that these factual distinctions do not warrant a contrary conclusion.

We have recognized that a party seeking to void an unambiguous provision in an insurance contract on public policy grounds bears a heavy burden. *See Generette,* 957 A.2d at 1190 (citing *Colbert,* 813 A.2d at 750). In the instant case, Appellant attempts to meet this heavy burden and to distinguish *Burstein* by demonstrating that as a member of a collective bargaining unit, he could not have negotiated with his employer for UIM coverage in the Pennsylvania State Police vehicle. However, Appellant has not demonstrated by any evidence of record that he could not have purchased a supplemental rider from Appellee that would waive the regular-use exclusion. Therefore, because Appellant has failed to meet his burden by proving that he could not obtain any UIM coverage in effect while he operated his work vehicle, he has not sufficiently distinguished this matter from the facts of *Burstein.*

Moreover, we find Appellant's reliance on the selected language in *Burstein* unpersuasive, as it is *dicta.* Our discussion of Mrs. Burstein's practical options for achieving UIM benefits on her employer-owned vehicle was specific to the facts of her case. *Burstein* was decided on public policy grounds, and the

lant's substitute brief at 12–13. As we conclude that this portion of *Burstein* was *dicta,* we have included the full quote herein.

key decisional language appears earlier in the opinion, wherein we stated:

> Here, voiding the exclusion would frustrate the public policy concern for the increasing costs of automobile insurance, as the insurer would be compelled to underwrite unknown risks that it has not been compensated to insure. Most significantly, if this Court were to void the exclusion, insureds would be empowered to regularly drive an infinite number of non-owned vehicles, and receive gratis UIM coverage on all of those vehicles if they merely purchase UIM coverage on one owned vehicle. The same would be true even if the insureds never disclose any of the regularly used, non-owned vehicles to the insurers, as is the case here. Consequently, insurers would be forced to increase the cost of insurance, which is precisely what the public policy behind the MVFRL strives to prevent. Such result is untenable.

*Id.* at 208.

The crucial factors underlying *Burstein* and the instant case are identical—an employee injured while driving his employer-owned vehicle attempted to recover UIM benefits from his private insurer without compensating the insurer for that unknown risk.[19] In that regard, we find that Appellant's position conflicts with the overall policies of the MVFRL, which include cost containment and the correlation between the scope of coverage and the reasonable premiums collected. *Hall,* 648 A.2d at 761. Therefore, we reaffirm *Burstein* and hold that the regular-use exclusion is not void as against public policy.

19. Appellant asks this Court to take judicial notice of the fact that GEICO's insurance application requires applicants to disclose their employer, and Appellant complied with that mandate. We decline to do so because: (1) the application was not part of the record on appeal; and (2) we consider such a position irrelevant, as mere notice to GEICO that Appellant is employed by the Pennsylvania State Police does not equate to accepting the risk of coverage in those circumstances. This is especially true given the increased risk of accident that corresponds with the specialized driving required of a police officer.

Appellant and the PAJ also assert that the regular-use exclusion violates the express language of the MVFRL. In advancing this argument, Appellant and the *amici* essentially seek to re-litigate *Burstein.* However, Appellant presents no compelling reason to revisit the prior decision.[20]

■ Next, Appellant claims that the regular-use exclusion violates 75 Pa.C.S. § 1731 specifically with regard to subsections (c) and (c.1).[21] Those subsections require the insurer to obtain written waivers of UIM coverage signed by the insured on the form established in the statute. Appellant suggests

**20.** As part of this argument, Appellant relies on cases from other jurisdictions that limit the scope of insurance exclusions. Appellant's substitute brief at 22. However, our analysis of the relied-upon authority demonstrates that these decisions relate to stacking of UIM benefits, which is not at issue in the present case.

**21.** 75 Pa.C.S. § 1731 provides, in relevant part:

(c) Underinsured motorist coverage.—Underinsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured motor vehicles. The named insured shall be informed that he may reject underinsured motorist coverage by signing the following written rejection form:

REJECTION OF UNDERINSURED MOTORIST PROTECTION

By signing this waiver I am rejecting underinsured motorist coverage under this policy, for myself and all relatives residing in my household. Underinsured coverage protects me and relatives living in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for all losses and damages. I knowingly and voluntarily reject this coverage.

* * *

(c.1) Form of waiver.—Insurers shall print the rejection forms required by subsections (b) and (c) on separate sheets in prominent type and location. The forms must be signed by the first named insured and dated to be valid. The signatures on the forms may be witnessed by an insurance agent or broker. Any rejection form that does not specifically comply with this section is void. If the insurer fails to produce a valid rejection form, uninsured or underinsured coverage, or both, as the case may be, under that policy shall be equal to the bodily injury liability limits. On policies in which either uninsured or underinsured coverage has been rejected, the policy renewals must contain notice in prominent type that the policy does not provide protection against damages caused by uninsured or underinsured motorists. Any person who executes a waiver under subsection (b) or (c) shall be precluded from claiming liability of any person based upon inadequate information.

that the regular-use exclusion violates these provisions because it removes the mandatory UIM coverage required by statute without complying with the written requirement of waiver on the form authorized by section 1731. Ultimately, however, Appellant's claim fails.

We recently addressed a similar argument involving the household exclusion to UIM coverage. In *Erie Ins. Exchange v. Baker*, 601 Pa. 355, 972 A.2d 507 (2009) (plurality), a policyholder who was denied coverage because of the household exclusion [22] to UIM coverage claimed that the exclusion amounts to an unsigned waiver of stacking in violation of 75 Pa.C.S. § 1738.[23] A majority of this Court held that the MVFRL's stacking provisions did not preclude application of the household exclusion. *Id.* at 513–14. In rejecting this argument, a plurality of this Court held that the exclusion was not a "waiver," but rather "a valid and unambiguous preclusion of coverage of unknown risks." *Id.* at 511. In his Concurring Opinion, Mr. Justice Saylor stated that he did not believe that the amendments to the MVFRL relating to stacking invalidated "long-standing policy exclusions (including regularly-used non-owned car, household, and territorial exclusions) rooted in ensuring the collection of reasonable premiums (with reasonableness being monitored by the Insurance Department)." *Id.* at 514–15.

In the present case, Appellant's argument similarly fails. The regular-use exclusion as applied here is neither an implicit waiver of coverage nor an improper limitation on the statutorily mandated coverage. Rather, it functions as a reasonable

**22.** The "household exclusion" to UIM coverage excludes coverage for any damages sustained by the insured while operating or being struck by a vehicle owned by the insured or a relative living in the insured's home who does not have UM/UIM coverage under the policy. In *Baker*, the claimant was injured in a motorcycle accident and sought UIM coverage from Erie Insurance Exchange, which provided coverage on three of the claimant's other vehicles but not the motorcycle. 972 A.2d at 508–09.

**23.** Section 1738(d) requires the use of a specific written waiver form to reject stacking of UM/UIM coverage, which is similar to the required written waiver form identified in 75 Pa.C.S. § 1731. *See* Note 21, *supra*.

preclusion of coverage of the unknown risks associated with operating a regularly used, non-owned vehicle. Indeed, an alternative reasoning would stifle the policies underlying the MVFRL and UIM coverage because the cost for UIM coverage would necessarily increase, and employers would have an incentive to underinsure their motor vehicles with the knowledge that injured employees could collect UIM benefits under their personal policies. We find both of these outcomes repugnant to the policy underlying the MVFRL.

Moreover, to the extent that Appellant and the PAJ ask us to reconsider the holding in *Burstein* and find that the regular-use exclusion itself violates public policy due to the conflict with the MVFRL, their arguments are misplaced. To reinterpret 75 Pa.C.S. § 1731 to preclude long-standing exclusions to UIM coverage on public policy grounds would violate the canons of statutory construction. *Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430 (2006), *cert. denied,* 549 U.S. 1169, 127 S.Ct. 1126, 166 L.Ed.2d 897 (2007). In *Mitchell,* we recognized that under the Statutory Construction Act, the rule of *stare decisis* requires adherence to prior decisions interpreting specific statutory language. We stated:

> [I]n ascertaining the legislature's intent, "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language." 1 Pa.C.S. § 1922(4).... [A]s we have recognized, "[t]he failure of the General Assembly to change the law which has been interpreted by the courts creates a presumption that the interpretation was in accordance with the legislative intent; otherwise the General Assembly would have changed the law in a subsequent amendment." *Fonner v. Shandon, Inc.,* 555 Pa. 370, [377–78], 724 A.2d 903, 906 (1999) (citation omitted); 1 Pa.C.S. § 1922(4).

*Id.* at 462 n. 20.

We decided *Burstein* in 2002. Since that time, the General Assembly has not amended section 1731 to preclude any of the long-standing exclusions to coverage. In that regard, it is clear that such exclusions are consistent with the legislature's

intent. *See Baker*, 972 A.2d at 515 (Saylor, J., concurring) (referring to the household and regular-use exclusions as "long-standing policy exclusions ... rooted in ensuring the collection of reasonable premiums"). Further, it is not the place of the judiciary to create an exception to the generally recognized rule in *Burstein* for "first responders." [24] Rather, our role is to interpret the laws as enacted by the General Assembly. We ruled in *Burstein* that the express language of the MVFRL does not preclude the regular-use exclusion. If the General Assembly wishes to implement a general policy in favor of "first responders," as it chooses to define the term, such determination remains the legislature's prerogative.

Finally, Appellant claims that Appellee is disingenuous when it suggests that employers such as the Pennsylvania State Police can purchase UIM coverage. Appellant argues that the employer's insurer would then decline coverage based on an exclusion for UIM coverage where workers' compensation benefits are received. While we believe such a claim ordinarily would be too speculative to consider, we simply note that we address the issue in *Heller v. PA League of Cities and Municipalities*, 613 Pa. 143, 32 A.3d 1213 (2011), also issued contemporaneously, finding that a workers' compensation exclusion to UIM coverage in an employer-purchased automobile insurance policy violates public policy.

In summary, we reaffirm the decision in *Burstein*, holding that the regular-use exclusion is not void as against public policy. A contrary decision is untenable, as it would require insurers to compensate for risks they have not agreed to insure, and for which premiums have not been collected. The order of the Superior Court is affirmed. Jurisdiction relinquished.

24. In this regard, we are troubled by the slippery slope, as Appellant proposes no reasonable limitation on the scope of "first responders" to whom a judicially-crafted exception to the regular-use exclusion would apply. PAJ goes further, advocating that the exclusion should never apply to any employees who drive fleet vehicles. These policy arguments are best left to the legislature instead of the courts.

Chief Justice CASTILLE and Justices EAKIN and BAER join the opinion.

Justice SAYLOR files a concurring opinion.

Justice BAER files a concurring opinion.

Justice TODD files a concurring opinion in which Justice McCAFFERY joins.

Justice SAYLOR, concurring.

I join the majority's holding and much of its reasoning. My modest differences are as follows.

First, I agree with the majority that there is a strong public policy favoring the protection of first responders. *See* Majority Opinion, *op.* at 124–25, 32 A.3d at 1202–03. Even so, I agree with Appellee that such policy is not so overarching as to override rational contractual limitations on coverage provided by commercial insurers in the absence of specific legislative or regulatory guidance. *See* Brief for Appellee at 1. In this regard, I fully support the majority's explanation that the critical issue in addressing geographic policy limitations lies in determining to what extent the General Assembly envisioned that coverage must be portable (or follow the insured outside the vehicle or vehicles listed on the policy). *See* Majority Opinion, *op.* at 127–29, 32 A.3d at 1204–05. While I dissented in *Burstein* based on the belief that the Insurance Department should exercise its rulemaking responsibilities to reassume an active role in determining the appropriate limits on portability, *see Burstein v. Prudential Prop. & Cas. Ins. Co.,* 570 Pa. 177, 220, 809 A.2d 204, 230 (2002) (Saylor, J., dissenting), I have seen little movement in that direction since that time. *Cf. Nationwide Ins. Co. v. Schneider,* 599 Pa. 131, 145 n. 8, 960 A.2d 442, 450 n. 8 (2008). Given that there are mixed policy concerns in play, and the Legislature and the regulators have not spoken clearly on this issue, it appears to me that, rightly or wrongly, much latitude has been left to the insurance companies in determining the appropriate degree of portability.[1]

---

1. As I explained in my responsive opinion in *Burstein,* the observation that the offer of UM/UIM coverage is mandatory does not answer the

I would also once and for all abandon the rubric that cost containment was the overarching policy concern of the Motor Vehicle Financial Responsibility Law, since the act clearly retained the core remedial objectives of the prior regulatory scheme. *See id.* at 145–46 & n. 8, 960 A.2d at 450–51 & n. 8.

Justice BAER, concurring.

Bound by *stare decisis,* I join the Majority Opinion, holding that the "regular use" exclusion does not violate public policy, even when applied to first responders. *See, e.g., Erie v. Baker,* 601 Pa. 355, 972 A.2d 507 (2009); *Burstein v. Prudential Prop. & Cas. Ins. Co.,* 570 Pa. 177, 809 A.2d 204, 230 (2002).

I write separately to applaud Justice Saylor in his concurring opinion in this case and Justice Orie Melvin in her Majority Opinion in *Heller v. Pa. League of Cities,* 613 Pa. 143, 32 A.3d 1213 (2011), in their acknowledgment of the limitations of the oft-repeated policy of cost containment. Justice Orie Melvin correctly observed in *Heller,* "While the enactment of the MVFRL grew out of a legislative concern for the 'spiraling' costs of automobile insurance, the cost containment objective cannot be mechanically invoked as a justification for every contractual provision that restricts coverage and purportedly lessens the cost of insurance." *Heller,* 32 A.3d at 1222. I emphatically agree with Justice Saylor that we should "once and for all abandon the rubric that cost containment was the overarching policy concern of the Motor Vehicle Financial Responsibility Law, since the act clearly retained the core remedial objectives of the prior regulatory scheme." *See* Concurring Op. at 137, 32 A.3d at 1210 (Saylor, J., concurring).

I recognize that the MVFRL was passed to control the spiraling auto insurance premiums paid by Pennsylvania drivers in the early 1980's. Indeed, I appreciate the concerns of the insurance industry, vociferously expressed in nearly every brief it files with this Court, that any expansion of insurers'

question of how far beyond insured vehicles the Legislature intended for the coverage to apply. *See Burstein,* 570 Pa. at 188, 809 A.2d at 210 (Saylor, J., dissenting).

risk of liability could lead us back to those spiraling premiums. Nonetheless, as with all exigencies, whether they be national (the economy), statewide (budget deficits), or local (transit woes), the reality is that they wax and wane. In considering the insurance industry's rhetoric, I cannot help but observe that the industry appears to be awash in revenue. It is hard not to notice the industry's spending on many discretionary activities, including incessant television advertising, the All–State Sugar Bowl, Safe Auto's sponsorship of the Ultimate Fighting Championship Series, and Progressive Field, home of the Cleveland Indians. In consequence, I join my colleagues in calling for advocates and the judiciary to cease their continued reliance on the unthinking perpetuation of the long-ameliorated concern for cost containment, and, if my supposition regarding the industry's financial status is correct, I urge the industry to reduce premiums as a humanitarian gesture to suffering Pennsylvanians.

I additionally write to express my agreement with my colleagues that strong public policy exists favoring the protection of first responders, as evidenced by the numerous statutes providing important and necessary protections for our first responders, including the Heart and Lung Act, as detailed in the Majority Opinion. Maj. Op. at 120–25, 32 A.3d at 1200–03. Nonetheless, I agree that any further protection in the form of automobile insurance benefits must come from the legislative branch and not this Court.

Accordingly, I join the Majority Opinion.

Justice TODD, concurring.

I concur in the result reached by the majority. The Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL") expressly sets forth a remedial public policy to promote the recovery of damages for innocent victims of accidents by mandating that insurers offer uninsured motorist ("UM") and underinsured motorist ("UIM") protection to insureds. 75 Pa.C.S.A. § 1731(a). Prior decisional law, while somewhat distinguishable on the facts from the situation before us, has upheld a "regularly used, non-owned car" exclu-

sion similar to that at issue in this appeal in light of our Commonwealth's public policy supporting cost containment as expressed in the MVFRL. *Burstein v. Prudential Prop. and Cas. Ins. Co.*, 570 Pa. 177, 809 A.2d 204 (2002). Finally, there exists a compelling public policy in our Commonwealth in favor of protecting the men and women who serve our citizenry as emergency first responders. When faced with the tension between or among important, yet divergent, policy concerns, I am compelled to conclude that it is the General Assembly who must act and not this Court. I write separately to express my views with regard to these competing policies, and, more importantly, to encourage the General Assembly to revisit these coverage questions, with an eye towards greater protection of our Commonwealth's emergency first responders.

The question before our Court is whether this exclusion of UIM coverage is violative of the public policy of our Commonwealth. As a general proposition, a court must give plain meaning to an insurance contract's clear and unambiguous language unless to do so would be contrary to a clearly expressed public policy. *Eichelman v. Nationwide Ins. Co.*, 551 Pa. 558, 563, 711 A.2d 1006, 1008 (1998) (citing *Antanovich v. Allstate Ins. Co.*, 507 Pa. 68, 76, 488 A.2d 571, 575 (1985)). As we indicated in *Eichelman,* public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. 551 Pa. at 563, 711 A.2d at 1008. Indeed, "[i]t is only when a given policy is so obviously for or against the public health, safety, morals or welfare that *there is a virtual unanimity of opinion* in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract is against public policy]." *Id.* (quoting *Mamlin v. Genoe*, 340 Pa. 320, 325, 17 A.2d 407, 409 (1941)) (emphasis added). Due to the inherently amorphous nature of the concept of public policy, "there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy . . . *Only dominant public policy* would

justify such action." 551 Pa. at 563, 711 A.2d at 1008 (emphasis added).

The MVFRL requires insurers to offer UM and UIM coverage to their insureds, and waiver of such coverage must be accompanied by signed statutorily-defined rejection forms. 75 Pa.C.S.A. § 1731(a), (c.1). Thus, by this mandate, the General Assembly has articulated a remedial public policy that promotes the recovery of damages for innocent victims of accidents from motorists who cannot adequately compensate such victims for their injuries. While the offer of such coverage is required, the purchase of UM/UIM coverage is optional. In the matter before us, we observe that GEICO limited the breadth of UM/UIM coverage by inserting certain exclusions into its policies. In particular, although State Trooper Williams purchased UIM coverage on his personal automobile policy, the policy contained a regular use exclusion which operates to preclude the UIM coverage he seeks herein. *See* Majority Opinion at 115, 32 A.3d at 1197.

There also exists a public policy favoring cost containment that served as the foundation of the General Assembly's 1990 amendments to the MVFRL and our decision in *Burstein*. We reasoned that this policy functioned to prevent insureds from receiving "gratis" coverage. 570 Pa. at 185, 809 A.2d at 208. Additionally, it worked to protect insurers from insuring *unknown and uncompensated risks*. Ultimately, our Court concluded in *Burstein* that voiding the regular use exclusion in automobile insurance policies would frustrate the public policy concern regarding increasing the costs of automobile insurance. *Id.*

Nevertheless, since the turn of the 20th century, our legislature and courts have accorded special protections to emergency first responders, which confirms our Commonwealth's public policy by safeguarding their rights as they endeavor to protect and serve our communities and our citizens. Indeed, our law is replete with examples of such special protections. The Heart and Lung Act, 53 P.S. § 637, enacted in 1935, provides full salary for temporary disability by certain emer-

gency personnel.[1] Similarly, the 1915 Workmen's Compensation Act, 77 P.S. § 27.1(m.1), and the 1939 Occupational Disease Act, 77 P.S. § 413, provide special protection to first responders injured in the course of their employment. These provisions impose a presumption that certain occupational diseases which occur during the course and scope of employment are work related, due to the unique hardships and challenges such workers face. Thus, based upon these laws, exemplifying the special status emergency first responders hold in our Commonwealth, I have no difficulty in concluding that there exists a long-standing and compelling public policy in favor of protecting the health and safety of Pennsylvania's emergency first responders.

While I acknowledge that our Court in *Burstein* found that cost containment was the "dominant" and "overarching" public policy underlying the MVFRL, 570 Pa. at 184 n. 3, 809 A.2d at 208 n. 3, I join those Justices who eschew the mantra of cost containment—used by various courts to rotely limit the rights of insureds—in favor of a recognition of other equally important policies and goals that are foundational to the MVFRL, such as the remedial objectives of the statute and the coverage rights of insureds.

1. The majority's suggestion that this statute was solely designed to "protect the municipality rather than the responder," Majority Opinion at 123, 32 A.3d at 1201, is overstated and belied by our prior decisions which acknowledge mixed purposes for the passage of the Heart and Lung Act. *See, e.g., Camaione v. Borough of Latrobe,* 523 Pa. 363, 366–67, 567 A.2d 638, 640 (1989) ("[W]e have emphasized that this remedial legislation provides compensation for police who suffer temporary incapacity or disability in the performance of their work. The guarantee of uninterrupted income during periods of temporary disability has been cited as an attraction for service in the police force and one that assures a reasonably speedy return to full active duty."); *Heath v. Pa. Bd. of Prob. and Parole,* 869 A.2d 39, 44 (Pa.Cmwlth.2005) ("[W]e note that the purpose of the Heart and Lung Act is to provide a full salary, not compensation, to employees in certain dangerous occupations who have been injured on the job and who are expected to recover and return to work in the foreseeable future."); *City of Pittsburgh v. WCAB (Wiefling),* 790 A.2d 1062, 1066 (Pa.Cmwlth.2002) ("The purpose of the Heart and Lung Act is to provide important public safety personnel with full compensation while disabled from an injury which occurs in the performance of duty.").

Accordingly, in the matter *sub judice,* we are faced with multiple significant policies—a remedial public policy to promote the recovery of damages for innocent victims of accidents, cost containment, and the protection of the health and safety of our Commonwealth's emergency first responders. The strain between and among these valid policies is palpable, as the policy of protection of emergency first responders through the receipt of UIM benefits is in direct conflict with the principle of reducing automobile insurance costs.

As that is the case, I conclude it is the members of the General Assembly, and not the Justices of this Court, who must act to definitively resolve the tension between the remedial policy underlying the statute, the laudable goal of cost containment in automobile insurance, and the compelling policy of protecting the men and women who serve our citizenry each day from undercompensation when they are the innocent victims of accidents involving uninsured or underinsured motorists. In my view, emergency first responders should not be subjected to the consequences of driving a vehicle without UIM coverage in light of the intent of the MVFRL and the public policy in favor of protecting these brave men and women. Therefore, I urge the General Assembly to consider measures to ensure that these public servants are not vulnerable to inadequate compensation for injuries incurred in the performance of their critical duties—by, for example, requiring that public employers purchase UM/UIM coverage for emergency first responders in their employ, or mandating that automobile insurers be barred from excluding UM/UIM coverage for emergency first responders.

Justice McCAFFERY joins this concurring opinion.